**THE ROSEN LAW FIRM, P.A.**
Phillip Kim (PK 9384)
Laurence M. Rosen (LR 5733)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com


Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| Robert Meeker and Amy Meeker,<br>Individually and on behalf of Carys Meeker, a Minor<br><br>*Plaintiffs,*<br><br>v.<br><br>Starfish Children's Services, Michael J. Bosmann,<br>Stephen Wall, Patrick McLaughlin, Deborah Coffey,<br>and Kathryn Anne Little<br><br>*Defendants.* | CASE NO.<br><br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

---

COME NOW, Plaintiffs Robert Meeker and Amy Meeker, Individually and on behalf of Carys, a minor (hereinafter referred to as "Plaintiffs"), by their undersigned attorneys, for their complaint against Defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through his attorneys. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### Nature of the Action

1.     This suit arises out of the injuries sustained by Plaintiffs due to the wrongful

conduct of Defendants.

## Jurisdiction & Venue

2.      Venue is proper in this Court because at least one Defendant resides or does business within New York County, New York, and/or Defendants may be summoned in New York County, New York. No other mandatory venue provision is applicable to this case which would make venue lie in any other county other than New York County.

3.      Venue is proper pursuant to 28 U.S.C. 1391(b)(1) and 1400(a), as at least one Defendant resides within this district.

4.      This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. 1332(a), as complete diversity exists in this case and the amount in controversy exceeds $75,000. Further, this Court has jurisdiction because Plaintiffs' damages are within the jurisdictional limits of this Court.

5.      This Court has personal jurisdiction over the Defendants here because they committed torts, in whole or in part, in New York County, New York; have purposefully availed themselves of the privileges of conducting activities and business in New York County, New York; one or more Defendants resides (or resided at the time the claims arose) or do business within New York County, New York; and/or Defendants may be summoned in New York County, New York. Further, this case is proper in New York County, New York, because Defendants consented to jurisdiction by their conduct and activities.

## Discovery Control Plan Level

6.      Plaintiffs intend to conduct discovery in this case under Level 3 of the Federal Rules of Civil Procedure 26(f)(2).


## Parties

7. Plaintiff Robert Meeker, is an individual and citizen of the State of Texas. Plaintiff Robert Meeker, is the adoptive father and next friend of Carys Meeker, a minor.

8. Plaintiff Amy Meeker, is an individual and citizen of the State of Texas. Plaintiff Amy Meeker is the adoptive mother and next friend of Carys Meeker, a minor.

9. Plaintiff Carys Meeker, a minor, is an individual and citizen of the State of Texas.

10. Defendant Starfish Children's Services is a corporation organized and existing under the laws of the State of Utah with its principal place of business in New York. The laws of the State of New York may control the Plaintiffs' claims against the Defendants. Defendant Starfish Children's Services has done and is doing business in the State of New York. Defendant Starfish Children's Services may be served by serving their acting general counsel, Benjamin W. Glass, III, at BenGlassLaw, 3915 Old Lee Highway 22B, Fairfax, Virginia, 22030. Defendant Starfish Children's Services is a citizen of New York.

11. Defendant Patrick McLaughlin is an individual and, at all times relevant to this action, was member of the Starfish Children's Services Board of Directors. Mr. McLaughlin may be served at his place of residence at 6 West 122nd Street, New York City, New York, 10027. Upon information and belief, defendant Patrick McLaughlin is a citizen of New York.

12. Defendant Michael Bosmann is an individual and, at all times relevant to this action, was member of the Starfish Children's Services Board of Directors. Mr. Bosmann may be served at his place of residence at 4013 139th Place SE, Mill Creek, Washington 98102-8920. Upon information and believe, defendant Michael Bosmann is a citizen of Washington.

13. Defendant Deborah Coffey is an individual and, at all times relevant to this action, was member of the Starfish Children's Services Board of Directors. Ms. Coffey may be served at

his place of residence at 6327 Hardwood Lane, Cicero, New York 13039-8842. Upon information and belief defendant Deborah Coffey is a citizen of New York.

14.     Defendant Kathryn Anne Little is an individual and, at all times relevant to this action, was member of the Starfish Children's Services Board of Directors. Ms. Little may be served at her place of residence at 217 Bellaire Drive, Knoxville, Tennessee 37934-3904. Upon information and belief, defendant Kathryn Anne Little is a citizen of Tennessee.

15.     Defendant Stephen Wall is an individual and, at all times relevant to this action, was member of the Starfish Children's Services Board of Directors. Mr. Wall may be served at his place of residence at 2309 62nd Street SE, Auburn, WA 98092-8379. Upon information and belief, defendant Stephen Wall is a citizen of Washington.

### Statement of Facts

16.     Carys Meeker is an 8-year-old girl who was born in China. Based upon information and belief, Carys spent the majority of her life in foster homes in China, run and/or managed by Defendant Starfish Children's Services and its Board of Directors, Defendants Patrick McLaughlin, Kathryn Anne Little, Deborah Coffey, Stephen Wall, and Michael Bosmann (collectively referred to as "Starfish").

17.     Robert and Amy Meeker first learned of Carys in May 2013, when she was approximately 5-years-old. The Meekers reviewed Starfish's website which clearly and unambiguously represented (or misrepresented) that Starfish "create[s] a medical history file for each child that details their history from the day they arrived to the day they are adopted."[1]

18.     After months of contemplation and after receiving what they thought was a complete and accurate picture of Carys's medical history, the Meekers finalized their letter of

---

[1] *See* Starfish Foster Home, Our Work at http://www.starfishfosterhome.org/our-work.php.

intent to adopt Carys in October 2013. The Meekers knew that Carys suffered from a form of spina bifida and that this medical condition somewhat limited her physical, cognitive, behavioral, and social abilities. Having already adopted two prior special needs children, after having a biological child of their own, the Meekers were not dissuaded by Carys's spina bifida and felt prepared to care for a child who had this specific medical condition.

**The Meekers Soon Learned of Starfish's Deceit**

19.     In April 2015, Robert Meeker flew to China to pick up their new daughter and bring her home. Robert was greeted at the airport with Carys, two employees of Starfish's foster home, and two large bottles of medication—medication with Chinese labels that Robert had no idea what to do with.

20.     No one would explain to Robert what the medication was for. Robert hoped and prayed that he could get his daughter back home in one piece, get her to a doctor, and figure out what he needed to do to keep his daughter safe, happy, and healthy. Luckily, Robert was able to bring Carys home. But that was only the beginning of the Meekers long and continuing battle to uncover their daughter's medical condition.

21.     As it turns out, Starfish had Carys on similar medications for years, even before the Meekers first learned of her. Robert learned of the medication the day he picked her up—nearly two years after they first requested information about her.

22.     Despite countless pleas with Starfish, no one from Starfish would provide the Meekers with any information about Carys's true medical background. So, the Meekers did the only thing they could and began a year-long battle of doctors' appointments, procedures, and trial-and-error process with countless medications. What the Meekers learned is that while Starfish told them of Carys's spina bifida, her spina bifida was the least of their concerns. Specifically, the

Meekers learned that, in addition to the spina bifida, Carys suffered from, including but not limited to, the following conditions:

- **Epilepsy** – Carys suffers through approximately **a dozen grand mal seizures daily.** Coincidentally, the medication Robert was given was to treat this epilepsy. Starfish knew of Carys's seizures and the extreme importance of the proper medication regime. Starfish simply did not care enough about Carys to fill her new parents in and ensure she was properly medicated. Importantly, Carys's seizures can happen at any time, day or night, requiring Carys to be constantly monitored. It is possible that Carys will have to undergo brain surgery to stop the countless daily seizures.

- **Abnormal Palate / Severely Rotten Teeth** – The state of Carys's oral health was so abysmal that she has had to undergo surgery to attempt to repair the damage.

- **Hydrocephalus**

- **Cerebral Palsy**

- **Scoliosis**

- **Brain Cerebella Dysplasia –** Carys was born with a severely malformed brain and does not have the normal form and structure.

- **Self-Harming –** Carys consistently engages in self-harming behavior, requiring eyes be on her at all times. Most often, Carys rubs her hands and wrists along the skin on her head, rubbing the skin raw until she is bleeding. Carys does this almost daily, leaving scabs scattered across her scalp at all times.







- **Blindness / Severe Vision Impairment** – Carys is, for all intents and purposes, blind. Carys has minimal light perception, but that is the extent of her vision capabilities.

- **Deafness / Severe Hearing Impairment** – Carys is, for all intents and purposes, deaf.

- **Sleeping Behaviors** – Carys screams loudly for most hours of the night. She cannot be kept in a bedroom close to the rest of the family due to her inability to sleep and her behavior during the night.

- **Hepatitis C**

- **Shortened Life span** – Due to Carys's various and significant medical issues, Carys has a much shorter than average life span. Carys needed to be placed into what the industry calls an "end of life family"—a family who knew they would only have a short time with this sweet girl and who were ready, willing, and capable of providing end of life care and burying a child. The Meekers were not such a family, but Starfish has forced them to be.

## Starfish Had Actual Knowledge of Carys's True Medical Needs All Along

23.     **Starfish had this information.** An information and care plan prepared for Kaitlyn (the name Carys was known by while in Starfish custody) by a Starfish volunteer nurse on October 24, 2012 discussed Carys's (Kaitlyn's) epilepsy diagnosis:

Info and Care plan for Kaitlyn   10/20/2012 by Shanell Williams (volunteer RN) **updated 10/24/2012**

**Background:** Estimated DOB 10/15/2007. Past medical history: Encephalocele (post surgical), hydrocephalus, VP shunt placed. Kaitlyn has been steadily losing weight since Jan 2012. On October 1st, I suggested to change her from regular milk to pediasure, and to add peanut butter to each of her meals. From Sep 28th - October 2nd she lost over 1 Kg according to our records, so I suggested we take her to the hospital for further testing. In the hospital, she was diagnosed with malnutrition and symptomatic epilepsy. Kaitlyn experience spasms in the hospital and her nanny states she was experiencing them when she starting caring for Kaitlyn in May of this year up until she was hospitalized. The doctors where she was hospitalized witnessed her movements and stated it was their opinion that she was having spasms/convulsions and that the results of an EEG also supported their diagnosis of epilepsy. Kaitlyn was prescribed sodium valporate and the spasms became less frequent soon after starting the med.   Kaitlyn was d/c from the hospital on October 17th. Nanny states that Kaitlyn is no longer having spasms. (See discharge summary for more information)

**Measurements:** weights every 3 days, length and head circ monthly. Plot and monitor growth chart. Recent weights: 10/17/2012 10.835kg 10/19/2012 11.175kg

**Current medication:** sodium valporate to treat epilepsy. Current dose at 0.3 grams/day divided into two doses. Blood level and liver function to be tested around Oct. 29 and routinely thereafter. Doctor Song who prescribed this med at BeiFang hospital stated that Kaitlyn will need to be on the med long term. He states that is may be possible to wean her off slowly if she is stable for 1-2 years.

**Future medical tests:** MRIs taken every 3 months to monitor brain growth and development. If healthy growth is noted, MRIs can be scheduled less frequently.

24.     A discharge record from the North Affiliated Hospital of Xian Medical University dated October 17, 2012 supports the above care plan discussing epilepsy, confirmed Carys's malformed cerebrum and cerebellum, and also notified Starfish of Carys's cerebral palsy.

西安医学院附属

西安市北方医院　　　　　　　出院纪录 Discharge record

North Affiliated Hospital of Xian Medical University

X光号　　　　　　　　　　住院号：1218126

Xray number　　　　　　　Hospital admit number

| | |
|---|---|
| Name: Yuxingke (Kaitlyn) Sex: Female　Age: 5　Employer: not employed Marital status: unmarried Address: Xi'an orphanage | |

Admittance date: 2012-10-3 14:44:45　　Discharge date：2012-10-17　　Total hospital stay: 14 days

Upon admittance: Patient brought to hospital because " weight has been dropping for 10 months".　Physical exam: temp: 36.5 Pulse 86 bpm, respirations 28 delayed development, not alert, thin. No jaundice or petechiae. surface lymph nodes not enlarged. Head tends to turn to the left. L shaped scar approx. 10 cm noted on occipital area of head, able to breathe through nose，pharynx not red, lungs sound course, no apparent moist or dry rales. Even pulse of 86 bpm, Abdomen concave, soft, approx. 4 cm surgical scar noted between sternum and naval, normal bowel sounds. Limbs atrophied. Anus and genitalia are without deformity. Several small, fluid filled bumps on and around labia. All limbs tense. When in a supported standing position, lower limbs cross like scissors and the tips of feet touch the ground, heel knee test hyper reflexia, kernig sign, brudzinski　sign, and babinski reflex all absent.

Diagnosis upon admission:
　　1. protein-calorie malnutrition
　　2. cerebral palsy

Tests and treatment after admittance:

tests after admission：routine blood panel: WBC 9.47 X 10^9/L, Neutrophils:

56.3%, lymph 31%, liver function，strep 0 ，kidney function, electrolyses,

troponin, CRP normal. ESR 10 mm/hour. myocardial enzymes：CKMB26U/L. Before blood transfusion, 4 diseases checkup normal. Hepatitis ABC and AIDS test negative。Abdominal x-ray normal. Head CT: hydrocephalus VP shunt placement change: hydrocephalus, ventricles expand. Ventricles have not developed normally, Cavum septum pellucidum normal。Head MRI, maldevelopment of cerebrum and cerebellum;　limitations pediatric abnormal EEG，provided lipids，administered amino acids, and po sodium valporate to treat epilepsy, and increased oral intake.

Diagnosis upon discharge:
　　1. protein-calorie malnutrition
　　2. cerebral palsy
　　3. epilepsy

12

25. A physical therapy report from a pediatric therapy center, dated October 1, 2013 also highlighted Carys's epilepsy and noted that she had been on medication to treat the epilepsy since July 2013:



**Olivia's Place Pediatric Therapy Center**

**Physical Therapy Evaluation for Xingke (Kaitlin) Yu**

Name:                      Xingke (Kaitlin) Yu
Date of Birth:             15th October 2007
Age at Assessment:         5 years, 11 months
Date of Assessment:        1st October 2013
Evaluator:                 Marla Balzer, Physiotherapist
Date of Report:            3rd October 2013

**Background Information**

Xingke (Kaitlin) Yu was born 15th October 2007 in Yulin, Shaanxi province.    She was born with spina bifida with a large encephalocele at the base of her skull. At 8 months old, Xingke had surgery to remove the encephalocele at the Shanghai Children's Medical Center. Also, she was recently diagnosed with epilepsy and has been prescribed Trileptal 4.5ml which is administered twice daily. She has been taking this medication since July 2013

Xingke was abandoned by her parents at birth and has received care at the Starfish Foster Home since that time. Her caregivers noted that she has been an otherwise healthy child. She has been seen by a pediatric dentist in regards to her teeth and has also been prescribed Floride. To date, she has not had her vision or hearing tested.

26. An email from Defendant Kathryn Anne Little, Starfish Board of Directors member, dated April 16, 2013, discusses the epilepsy diagnoses. Defendant Little's communication also reveals that it was noted somewhere in Carys's file that **she had epilepsy three years prior to the date of the email—approximately 2010.** Thus, **Starfish knew of Carys's severe epilepsy in 2010, failed to treat it for three years** until the child was sent to the hospital for malnourishment, and then deliberately chose not to tell the Meekers.

--------- Forwarded message ---------
From: **Anne Little** <[redacted]>
Date: Tue, Apr 16, 2013 at 3:41 AM
Subject: Fwd: Kaitlyn document
To: Naomi Kerwin <[redacted]>
Cc: Cindy Klaja McLaughlin <[redacted]> at McLaughlin <[redacted]>

Hi Naomi,

Paul's assessment of Kaitlyn really did a lot to help me see her current functioning level and condition. It's really pretty sad. Especially since we can't really say how much of her present functioning level is a result of medical issues and how much is a result of lack of attention.

First, and foremost, we need to find her adoption file. Could you please bump whoever needs to be bumped to get an answer on where that file is? We need it to show up on the shared list, or get assigned to an agency we can work with. Lifeline would be a good choice, as they are willing to transfer the grant fees that were paid to them to another family who uses them.

Another very important thing we need to take care of ASAP are those medical test disks that Cindy needs to get reviewed. I think they are MRI and brain scans? Could you please find readable copies of those asap and get them to Cindy? We need those yesterday.

Paul mentions that Amanda noted 3 years ago that Kaitlyn had epilepsy. It's awful this was totally missed until she landed in the hospital for low weight. :( Can you find out if she is still on the epilepsy medicine they put her on in the hospital when we had her? Was she on it the day Paul evaluated her? Wondering if these meds could have caused some of the non responsiveness he reported. Regardless, it's important to note what meds she is on so the info can be passed on to the drs reviewing her MRI's and brain scans. Would the orphanage share meds with dosage amounts with you if you asked nicely?

27.    An MR report from China again confirmed for Starfish Carys's brain cerebella dysplasia:



Diagnosis Suggestions:
The brain cerebella dysplasia:
1.  The brain white matter were dysplasia, both sides of the brain were asymmetry, right part was bigger than the left, bilateral frontal lobe and half egg circle center small focal ischemia, septum pellucidum, vault column lack. Corpus callosum dysplasia. Pons, medulla oblongata, quadrigemina slim lead to the midbrain aqueduct not apparent, the relevant brain cisterns increased apparently.
2.  Cerebellar dysplasia, lost the normal form and structure.

28.    **Starfish had all of this information and much, much more long before the Meekers first learned of Carys.** The Meekers deserved this same information so that they could make an informed decision about the child they were bringing into their family. Carys deserved for her prospective family to have this same information so that they were ready and prepared to provide for her various significant medical needs. Unfortunately, Starfish deliberately chose to shield this information from the Meekers until it was too late, placing Carys into a medically precarious situation and the Meekers into an impossible one.

29.     Perhaps most egregious is the fact that Starfish had an opportunity to explain all of this to Amy Meeker in person. Indeed, in October 2013, Amy travelled to China to meet her new daughter. Amy was able to sit with Carys for approximately half an hour. From her time, it was clear that Carys had some of the developmental delays that Starfish had warned her of, and that the spina bifida would largely confine Carys to a wheelchair. During that half an hour, Starfish could have explained to Amy the full extent of Carys's medical problems, detailing all of the conditions that Amy could not see with her naked eye. Starfish deliberately chose not to do so.

30.     The most illustrative example of what Starfish knew and what it chose to tell prospective adoptive families comes in the form of an email from Naomi Kerwin. In this email, Naomi in one paragraph details Carys's true mental capacity and physical capabilities. In the second paragraph, Naomi discusses what Starfish has chosen to put on the website to describe Carys.

From: **Naomi Kerwin** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Date: Wed, Sep 26, 2012 at 6:29 PM
Subject: Re: Kaitlyn Advocacy Help -- ASAP
To: Cindy Klaja ▮▮▮▮▮▮▮▮▮▮▮▮
Cc: Anne Little < ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**I have this write up for Kaitlyn:**

Kaitlyn has the mental capacity of a child of around eight months old. She can move her neck, turn her head, kick her legs, rock herself when in a rocker and she can recognise the direction that voices are coming from. At the moment she is spoon fed but she opens her mouth and is able to take food from the spoon and swallow. She can also hold a bottle of milk and feed herself with that. She cannot sit up by herself or hold her head up. She shows signs that she might understand her own name when it is called but she does not understand when people talk to her. She responds well to touch i.e if you touch her skin, her hand will go to that place. She can smile and she enjoys being held and cuddled but she does not show signs of 'connecting' with any particular individual. She does not actively play with toys but we feel like she enjoys having them around her.

Kaitlyn's website description
Kaitlyn likes music and in particular being sung to while you hold her hand or touch her ears. She finds it very relaxing to be in a rocking chair and will happily sit in one, drinking milk and watching the world go by. Kaitlyn really likes to be around people and follows the sounds of their voices, she likes to have other children around her and they like to play with her too. Kaitlyn loves to be picked up and cuddled. Giving her lots of kisses and love and is one of the best ways to make her smile.

for technical reasons I don't have photos but will get to you tomorrow.

31.     Starfish was not concerned with placing Carys with a proper home, fully equipped to handle and care for her various medical issues. Starfish was just concerned with getting Carys out of its foster home and passing her along to an unsuspecting and completely unprepared family.

**The Starfish Motto: "smile, nod and clap when appropriate if asked about K."**

32.     Extensive email communications between a Starfish and its Board of Directors, and a Starfish worker caring for Carys, Naomi Kerwin, reveal that Starfish intentionally withheld information from the Meekers about Carys's true medical condition and needs. Starfish apparently felt that it was not their job to ensure the Meekers were financially and emotionally prepared to take on a child like Carys. Instead, their job was to withhold information and ***"smile, nod and clap when appropriate if asked about K."***  This conduct shocks the conscious.

On Wed, Sep 25, 2013 at 9:25 PM, Patrick McLaughlin ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ wrote:
Naomi, I have a recommendation for you to consider regarding the message you send, both verbally and non-verbally, related to K's condition.

As I read the emails, both from the past 48 hours and the past year, a dominating theme is an over-communication of ensuring the adoptive family is fully aware of her condition.  To me it is as if you want to erect a billboard on the highway  with K's picture with the words, "...adoptive family beware this child is really screwed and you better think twice before you take her back home".  Now..I know in your heart that you don't actually feel that way, but I struggle to understand why it is omnipresent in your missives about K.

The board gives you a receipt that we all "get it" regarding the family being realistically aware of the long term commitment they are making by adopting K.  The adoptive mother is not new to the world of special needs kids and I anticipate she is coming prepared for the unknown. Let's stop projecting on how you feel the mom-to-be will respond upon laying eyes on K.  Your role now is to smile, nod and clap when appropriate if asked about K.

We don't need to live in the world of "was" and "is" regarding K as we all know what challenges are ahead for both her and her adoptive family.  The focus is on her future as you know.  This kid was born with enough millstones around her neck. Let's not add another stone in the form of "buyers remorse" by the adoptive family.

I am not going to burden you with a request to respond as my message is clear and actionable.  You are an advocate for K.  You are not an advocate for the parents at this point in the process.  For better or worse, Starfish has done it's job and the family takes over accordingly.

P

33.     Starfish intentionally mislead and misrepresented the reality of Carys's condition to prospective adoptive families. No, they only wanted prospective families to see Carys's **"Best in Show"** photographs.

On Tue, Sep 25, 2012 at 11:22 PM, Cindy Klaja ▮▮▮▮▮▮▮▮▮▮▮
Naomi,

Anne Little has some great contacts in the adoption community world wide and we are ready to use her network to advocate for Kaitlyn. We found out that Kaitlyn's current profile has some really horrible photos in her adoption file which doesn't bode well for getting a forever family and the comment that came back is that "she doesn't look like a Starfish baby." She is also on the shared list.

There is a family out there for her -- we just have to find them.

We think that we can help via social media -- if you can help us out on the following:

1. Can you send current "Best in show" photos of Kaitlyn looking her best (smiling, holding a toy, being hugged and loved on by her nanny or a volunteer)

2. Can you find out from Yulin if you can get the new photos and updated info on Kaitlyn added to her permanent file there?

3. Can you answer for us the following questions:

What is her mental capacity?
What can she do?
Does she understand anything that is going on
Is she able to feed herself? Is she on a feeding tube?
Can she sit up?
Can she hold her head up?
Does she know her name?
Does she understand when her name it called?
Does she understand when people talk to her?
Is she totally paralyzed?
Can she smile?

**Starfish Had a Habit of Lying About Carys's Condition to Prospective Families**

34.     **The Meekers were not the first family to be deceived by Starfish.** Extensive email communications between a Starfish, its Board of Directors, and Naomi Kerwin reveal that Starfish had another family lined up to adopt Carys, prior to the Meekers. In January 2013, Naomi raised concerns with Starfish regarding the extent of the knowledge this prospective family had, very similar to the concerns Naomi raised regarding the extent of the Meekers' knowledge.



From: **Naomi Kerwin** ▮▮▮▮▮▮▮▮▮▮▮▮
Date: Thu, Jan 10, 2013 at 9:06 PM
Subject: Re: Call my cell when you get this message
To: Patrick McLaughlin ▮▮▮▮▮▮▮▮▮▮

Taylor Williams is a godsend for a few years. She is a young woman who works as a liaison with adoptive families and Starfish. i.e. when ▮▮▮▮ needed to be fitted for shoes I asked Taylor to check with his matched family to see if they wanted us to get him shoes or if they wanted to wait until he arrived int he US, they opted for him to start being fitted for shoes now.

I have no idea what is in Kaitlyn's file which was my concern expressed to Taylor and I don't know what she did with that. If everything is correct there is no problem. If the family doesn't have all of the medical information it is better to sort it out now than to have problems when they arrive. Do you agree? From what I know about them is that they want to be sure of what they are getting into, if they are sure they can handle it they will accept her. Kaitlyn is making HUGE progress. I have been through a refused adoption second hand and have no desire to go through it again further there is no advantage if it will jeopardize ▮▮▮▮ or ▮▮▮▮ doption.

I am sludging through the immediate issues and want to talk with you about this soon.

N

35. Naomi relayed to Starfish that it would be terrible for this first family to get Carys and **watch her go through an epileptic seizure, and then refuse the adoption**. Naomi also informed Starfish that she feared that the family might have unrealistic expectations of Carys's abilities, and how problematic that could be.

On Wed, Jan 9, 2013 at 6:30 PM, Naomi Kerwin ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ wrote:
Last night we called the police and Apple left before they arrived promising to come back and hurt us. I ended up sleeping in the dorm and will continue until the window in my room has a decent lock.

I didn't talk to Kaitlyn's mother, I talked to Taylor, which I do frequently. I told her that I was worried that Kaitlyn's family did not have a realistic view of Kaitlyn's condition. I do not know what Taylor told Kaitlyn's mother.

My fear, and I have told you before, is that they will arrive and refuse the adoption because Kaitlyn's condition was not well represented. For example, if they take her to the hotel and she gets what looks like an epileptic seizure which would be likely with her in a strange environment, they may refuse the adoption and be completely within their rights to do so. I am not aware of any one asking about Kaitlyn's capabilities. From her files it looks like Kaitlyn had more capability when she was 8 months old than she does now. I don't know what Kaitlyn's family has been told, but Ido know that her FB comments like how her children will learn from each other isn't a realistic expectation.

36.     Starfish ignored these concerns with this first family and **the adoption fell through.** Starfish intentionally withheld these concerns from the Meekers, knowing that they would have to try even harder to keep Carys's medical condition a secret. This time, Starfish succeeded in hiding the important information until it was too late.

**Starfish Gave Up on Caring for Carys**

37.     Quite alarmingly, Starfish eventually stopped caring for Carys's care. This is, of course, after Starfish, among other things, had already failed to treat her epilepsy properly, despite having knowledge of it for over three years, and after Carys went through several hospitalizations for malnourishment and protein deficiencies.

38.     In a May 2014 email, Naomi notes Cary's severe regression and how significantly Carys's care was departing from the physical therapy plan of action that had worked so well for Carys for so long.

Hi Anne,

How are you?  Hope all is well!

We just came back from seeing K.  She is looking well, a little pudgy.  A few things I think you should be aware.

When we sent K off she had an exercise ball so she could have daily PT designated by the PT at Olivia's Place.  We also sent several pdfs' of exercises that needed to be done throughout the day   The ball isn't there and Xiao Liu seems to have forgotten the exercises.  She says that a PT comes once a week but it was clear that the other exercises were not happening.  When she was a TCG she was sitting by herself on a stool and even starting to clap.  She is doing neither, and cannot even sit by herself on the floor for a minute without falling over.  They are keeping her in the bumbo chair or wheelchair.  K's regression is alarming.

K's food is strictly baby food, mush.  The ST/PT was very clear that she needed food with a little crunch and a variety of tastes.

K is not drinking on her own, no bottle or sippy cup, certainly no straw.  When she was at Yulin SWI she lost her ability to suck.  The ST at Olivia's Place had some exercises to help her regain the ability to suck.  She is being spoon fed water and Xiao Liu doesn't think it is necessary since she is eating so much mush.

In the hour we were there I saw K have about 5-7 short spasms.  Xiao Liu said that she has been in to see Dr. Bao to keep her liver in check but since the spasms are very small in comparison I don't think she realizes what they are.  She did not report them to Dr. Bao.

I have a few friends who regularly volunteer at SHH.  If you would like to be in contact with them to better monitor K I will gladly introduce you.

Attached is a photo and an adorable video of K giving us the raspberry ;-) that you can send to Amy.  I have been in communication with Amy but would rather leave the reports to Starfish to give her.

Please confirm receipt and that actions will be taken.  I have invested a lot into this child and would like to see her living to her potential.

N

From:
Date: Thu, 8 May 2014 17:42:17 +0800
Subject: Re: K
To:

Dear Anne,

Obviously there was no intention to give her the care she needs if the equipment that was given to them isn't even present. According to the PT and ST the way Xiao Liu is treating her (over-babying) is causing her to regress. She can't sit up, she needs to be spoon fed water....Not once at SHH have I seen anyone with more authority than a nanny there.

**The Fallout from Starfish's Fraud**

39.     As a proximate result of Starfish and its Board of Director's wrongful conduct, Carys has already required in excess of **$500,000.00** in medical care and treatment, just in the 11 months that the Meekers have been taking care of her. Not surprisingly, the estimated amount to provide care to Carys throughout her shortened-life is in the **multiple millions of dollars.**

40.     Robert and Amy were fraudulently induced by Starfish and its Board to adopt Carys.

41.     Robert and Amy do not wish to revoke their adoption, as they have already welcomed Carys into their home and love her. Had Robert and Amy known the full extent of Carys's medical condition and needs, they would not have completed their adoption, as they did not—and currently still do not—have the capabilities to care for a child with such needs. More importantly, however, Robert and Amy were not emotionally prepared to be an end of life family, but Starfish forced them into the role.

**First Claim**
**Wrongful Adoption**
**(Against All Defendants)**

42.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

43.     Defendants owed the Meekers, a prospective adoptive family, the duty to provide them with Carys's complete medical history. Defendants failed to do so, excluding medical records in their possession which indicated to some degree that Carys had a host of debilitating, permanent, and life-threatening medical conditions.

44.     Defendants made a representation to the Meekers that Carys was afflicted with spina bifida and some developmental delays.

45.     Since bringing Carys home, the Meekers have learned that Defendant's representations were materially false as they were laughably incomplete. Indeed, Defendants committed fraud, concealment, and/or misrepresentation when, prior to Carys's adoption, they purposefully chose to withhold from the Meekers that Carys suffered from a number of serious medical conditions, including, but not limited to, the following:

- Epilepsy (grand mal seizures)

- Abnormal Palate / Severely Rotten Teeth

- Hydrocephalus

- Cerebral Palsy

- Scoliosis

- Brain Cerebella Dysplasia

- Self-Harming Tendencies

- Blindness / Severe Vision Impairment

- Deafness / Severe Hearing Impairment

- Disruptive Sleeping Behaviors

- Hepatitis C

- Shortened Life span

46.     Based upon reasonable information and belief, Defendants intended to deceive the Meekers. Defendants knew or should have known of Carys's advanced conditions, but failed to advise the Meekers of such conditions in fear of the adoption falling through, as at least one of Carys's prior prospective adoptions had done.

47.     The Meekers believed and justifiably relied upon Defendants' statements that Carys suffered only from spina bifida and some developmental delays. Their belief in and justifiable reliance upon Defendants' statements induced them to adopt Carys. As a result of this reliance, the Meekers sustained significant pecuniary loss for which they now sue.

**Second Claim**
**Negligence and Gross Negligence**
**(Against All Defendants)**

48.     Plaintiffs incorporate by reference the allegations set forth in set forth in the preceding paragraphs as if fully set forth herein.

49.     Defendants owed the Meekers, a prospective adoptive family, the duty to provide them with Carys's complete medical history. Defendants failed to do so, excluding medical records in their possession which indicated to some degree that Carys had a host of debilitating, permanent, and life-threatening medical conditions

50.     At all times herein mentioned, Defendants had a duty to exercise ordinary care in handling all aspects of Carys's care and the Meeker's adoption of Carys, including providing relevant and necessary medical information to the Meekers, and providing relevant and necessary medical care to Carys while she was a resident at one of Defendants' foster homes.

51.     At all times herein mentioned, Defendants knew, or in the exercise of reasonable care, should have known, that allowing a family to adopt a child without adequately informing that family of the child's special and serious medical conditions would likely cause harm to both the

family and the child. Defendants created a dangerous and unsafe environment for both Carys and the Meekers by negligently withholding Carys's important medical information.

52.     Notwithstanding the aforesaid duties, Defendants failed to properly exercise or perform certain duties, by committing one or more wrongful acts and/or omissions and failures.

53.     The Defendants, each and every one of them, acted recklessly and with gross and active negligence and with a conscious disregard for the safety and well-being of the Plaintiffs by failing to take reasonable measures to advise the Meekers of the extent of Carys's medical conditions. In so doing, the Defendants, each of them, favored profit over the safety and well-being of a family and a little girl and acted with malice, oppression, and fraud. As such, Plaintiffs are entitled to an award of punitive damages in an amount sufficient to punish and deter.

54.     Each of these acts and/or omissions, singularly or in combination with others is a proximate, direct, and/or producing cause of the occurrence made the basis of this lawsuit, Plaintiffs' causes of action, injuries, and subsequent damages described herein.

### Third Claim
### Negligent Misrepresentation
### (Against All Defendants)

55.     Plaintiffs incorporate by reference the allegations set forth in set forth in the preceding paragraphs as if fully set forth herein.

56.     Defendants owed the Meekers, a prospective adoptive family, the duty to provide them with Carys's complete medical history. Defendants failed to do so, excluding medical records in their possession which indicated to some degree that Carys had a host of debilitating, permanent, and life-threatening medical conditions. Defendants were aware of material medical information, on which Plaintiffs justifiably relied in determining to adopt Carys. As a direct and proximate result of Defendants' negligence, Plaintiffs suffered damages.

57.     At all times relevant to this action, Defendants knew or should have known certain medical conditions of Carys Meeker.

58.     Despite this actual or constructive knowledge and despite their duties to Plaintiffs, Defendants communicated and made one or more misrepresentations to Robert and Amy Meeker.

59.     Defendants failed to exercise reasonable care or competence, including but not limited to, failure to accurately represent to Robert and Amy Meeker certain important, material, and necessary medical information regarding Carys, failing to act as a reasonably prudent American-owned foster home would under the same or similar circumstances, and failing to exercise reasonable care to avoid a foreseeable risk of injury to others, including the Meekers.

60.     Robert and Amy, being reasonably careful persons under the circumstances, attached importance to the material (mis)representations made in determining their course of action and justifiably relied on Defendants' (mis)representations.

61.     Consequently, the withholding of material and relevant medical information has been to Robert, Amy and Carys Meeker's detriments.

62.     Each of these acts and/or omissions, singularly or in combination with others is a proximate, direct, and/or producing cause of the occurrence made the basis of this lawsuit, Plaintiffs' causes of action, injuries, and subsequent damages described herein.

**Fourth Claim**
**Intentional or Fraudulent Misrepresentation**
**(Against All Defendants)**

63.     Plaintiffs incorporate by reference the allegations set forth in set forth in the preceding paragraphs as if fully set forth herein.

64. Defendants communicated and made one or more material (mis)representations to the Meekers about the characteristics of Carys's medical background. These material representations were false.

65. Based upon reasonable information and belief, Defendants intended to deceive the Meekers. Defendants knew or should have known of Carys's advanced conditions, but failed to advise the Meekers of such conditions in fear of the adoption falling through, as at least one of Carys's prior prospective adoptions had done.

66. The material representations created an untrue and/or misleading impression in the minds of the Meekers of actual past or present facts. Being reasonably careful persons under the circumstances, the Meekers attached importance to the material (mis)representations and acted in reliance upon them in determining their course of action. Consequently, Plaintiffs suffered injuries.

67. The Meekers believed and justifiably relied upon Defendants' statements. Their belief in and justifiable reliance upon Defendants' statements induced them to adopt Carys. As a result of this reliance, the Meekers sustained significant pecuniary loss for which they now sue.

68. Each of these acts and/or omissions, singularly or in combination with others is a proximate, direct, and/or producing cause of the occurrence made the basis of this lawsuit, Plaintiffs' causes of action, injuries, and subsequent damages described herein.

### Fifth Claim
### Child Abuse, Neglect and/or Endangering the Welfare of a Child
### (Against All Defendants)

69. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

70. At all times relevant herein, Carys is a child less than 18 years of age and Defendants were Carys's caretakers.

71. Defendants' actions and/or failures to act within their obligations as Carys's caretakers resulted in serious physical and/or emotional harm to Carys.

72. Defendants failed and refused to exercise reasonable diligence in the control of Carys to prevent her from becoming an abused or neglected child. Defendants failed to provide Carys, a child, with the elements necessary for proper development, including, but not limited to, adequate supervision, housing, food, medical treatment, and limiting physical contact and affection.

73. Carys's physical, mental, and/or emotional condition was impaired or in imminent danger of becoming impaired due to the failure of Defendants to exercise a minimum degree of care in providing Carys with proper supervision or guardianship.

74. Defendants created a risk of harm to Carys within the meaning of the child endangerment statute by failing to provide her with the required medical treatment and/or other medical necessities, and creating a risk of harm to Carys by placing her with a family who was unaware of her medical condition, and therefore unable to care for her properly.

75. As a direct and proximate result of Defendants' actions, Carys suffered significant damages.

**Sixth Claim**
**Breach of Contract**
**(Against All Defendants)**

76. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

77. Defendants' representations to the Plaintiffs were knowing lies, which were made for the purpose of illegally and immorally forcing the adoption through.

78. Plaintiffs did not know that Defendants were lying nor did they have any reason to know they were lying or intending to commit a fraud upon them.

79. Plaintiffs entered into a binding agreement with Defendants. The agreement was supported by valuable consideration. Defendants intentionally breached this agreement. As a result of the breach, Plaintiffs have damages, which include, but are not limited to, pecuniary loss. Accordingly, Defendants are liable for breach of contract.

**Seventh Claim**
**Violation of Section 349 of New York General Business Law**
**(Against All Defendants)**

80. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

81. At all times relevant to this action, Plaintiffs were consumers.

82. The acts and practices Defendants were engaged in, at all times relevant to this litigation, were consumer-oriented.

83. The acts and practices Defendants were engaged in, at all times relevant to this litigation, were misleading in a material respect. Specifically, Defendants mislead Plaintiffs on the material topic of Carys's overall health and medical needs.

84. Plaintiffs were injured as a result of Defendants' deceptive acts and practices.

**Eighth Claim**
**Intentional Infliction of Emotional Distress**
**(Against All Defendants)**

85. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

86. Defendants engaged in extreme and outrageous behavior and intentionally or recklessly caused severe emotional distress, mental trauma and bodily harm to Plaintiffs.

Defendants' intentional and reckless conduct has caused severe mental stress to the Plaintiffs, for which they now sue.

**Ninth Claim**
**Respondeat Superior**
**(Against All Defendants)**

87.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

88.     Plaintiffs further allege that at the time the incident made the basis of this lawsuit occurred, and at all material times hereto, Defendants' agents, servants and/or employees were acting within the course and scope of their employment and in the furtherance of the business interest of Defendants.  In this regard, Plaintiffs plead and invoke the doctrine of *respondeat superior* and alleges that each negligent act and/or omission on the part of the Defendants' agents, servants and employees are imputed to Defendants and that Defendants are vicariously liable for all negligent acts and/or omissions alleged herein to have been perpetrated by the Defendants.

**Tenth Claim**
**Board of Director Liability**

89.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

90.     Pursuant to New York Not-for-Profit Corporation Law Section 720-a, Plaintiffs bring this suit against the Board of Directors for Starfish Children's Services in their capacity as directors, officers or trustees with Starfish Children's Services, as they acted with gross negligence and intended to cause the resulting harm to Plaintiffs.

91.     The Defendants, each of them, personally and directly injured Plaintiffs.

92.     The Defendants, each of them, acted in an intentionally fraudulent, illegal, or clearly wrong manner that caused harm to the Plaintiffs.

## Personal Injuries and Damages

93.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

94.     Plaintiffs seek damages in excess of the jurisdictional minimums of this Court.

95.     As a proximate cause of Defendants' unlawful acts and/or omissions described herein, Plaintiffs have suffered severe bodily, economic, mental, and emotional injuries. Consequently, Plaintiffs seek all general and special damages to which they are entitled to recover, including but not limited to, medical expenses and other pecuniary losses; physical and mental pain, suffering and anguish; physical impairment; disfigurement; loss of earnings/impairment of earning capacity; and loss of household services. Plaintiffs will continue to suffer from these injuries for the rest of their lives and seek compensation for such future damages.

96.     Pursuant to the New York General Business Law section 349, Plaintiffs are entitled to recover from Defendants all reasonable and necessary attorneys' fees incurred in the prosecution of this action, costs, and penalties.

## Exemplary Damages

97.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

98.     Defendants engaged in conduct life-threatening to humans; the conduct was committed with reckless disregard for the rights of others or intentionally and with malice towards others; Defendants acted with wanton disregard for the public and Plaintiffs' safety; and Defendants were either ware or did not care that there was a substantial and unnecessary risk that the conduct would cause serious injury to others, including Plaintiffs.

99.     Defendants' conduct was unreasonable under the circumstances and there was a high probability that the conduct would cause serious harm to others, including Plaintiffs.

100.     Plaintiffs are therefore seeking recovery of punitive, exemplary and any other additional damages that the law allows under the causes of action asserted against Defendants.

## Conditions Precedent

101.     All conditions precedent to Plaintiffs' right to recover the relief sought herein have occurred or have been performed.

## Relief Sought and Prayer

102.     Plaintiffs request Defendants appear and answer, and that this Court set the case for a jury trial, the case be tried, after which Plaintiffs recover:

a.   Judgment against Defendants for a sum within the jurisdictional limits of this Court for the damages set forth herein.  Plaintiffs prefer to have a jury determine the amount of their damages, including exemplary damages;

b.   Pre-judgment and post-judgment interest at the maximum amount allowed by law on all elements of applicable damages claimed herein;

c.   Costs of suit, pursuant to the New York General Business Law section 349;

d.   Civil penalties, pursuant to the New York General Business Law section 349;

e.   Equitable attorneys' fees;

f.   All reasonable and necessary attorneys' fees incurred in the prosecution of this action, pursuant to the New York General Business Law section 349; and

g.   Such other and further relief, both general and specific, at law or in equity, to which Plaintiffs may be justly entitled.

## Jury Trial Demanded

103.    Plaintiff hereby demands a trial by jury for all causes and issues so triable.


Dated: March 28, 2016                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**


/s/Phillip Kim_____
Phillip Kim (PK 9384)
Laurence M. Rosen (LR 5733)
275 Madison Avenue, 34th Floor
New York, NY  10016
Phone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

-And-

**PAYNE MITCHELL LAW GROUP**

James L. Mitchell
State Bar No. 14214300
Heather V. Davis
State Bar No. 24092324
2911 Turtle Creek Blvd, Suite 1400
Dallas, Texas 75219
214/252-1888 (Telephone)
214/252-1889 (Facsimile)

-And-

**GRESHAM, P.C.**

R. Dean Gresham
Texas Bar No. 24027215
dgresham@greshampc.com

ATTORNEYS FOR PLAINTIFF